# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| BARBARA COSGROVE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. CV-04-S-149-NE** |
| | ) | |
| RAYTHEON COMPANY LONG- | ) | |
| TERM DISABILITY PLAN, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Barbara Cosgrove, filed this action on January 28, 2004, pursuant to section 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Ms. Cosgrove named as defendants Raytheon Company, her former employer; the Raytheon Company Long-Term Disability Plan (the "Plan"); and Metropolitan Life Insurance Company, which is the Claim Administrator for the Plan. She claims she was wrongfully denied long-term disability benefits under the Plan.[1]

## PART ONE

### *Facts and Procedural History*

The case originally was assigned to United States Magistrate Judge Robert R.

---

[1] *See* Complaint, appended to doc. no. 1 (Notice of Removal).

Armstrong.  It was reassigned to the undersigned after Judge Armstrong completed summary judgment proceedings, because the parties did not consent to the exercise of final jurisdiction by a magistrate judge.  The case presently is before this court on defendants' motion for summary judgment.[2]

Defendants assert that plaintiff's claims must be dismissed as untimely because: (1) she failed to file a request for an administrative appeal within sixty (60) days of receiving notice of the denial of her benefits, as required by the Plan; and (2) she failed to file suit within the limitations period set forth in the Plan.[3]  The Magistrate Judge issued a Report and Recommendation on January 11, 2006 (the "original R & R"), suggesting, but not formally recommending, that plaintiff's request for an administrative appeal should be considered timely.  He nevertheless recommended that defendants' motion for summary judgment should be granted, despite the timely administrative appeal, because plaintiff failed to file suit within the contractual limitations period.[4]  Plaintiff objected to that portion of the original R & R which recommended that her lawsuit be considered untimely,[5] and Judge Armstrong issued an amended R & R on February 3, 2006 (the "amended R & R"),

---

[2] Doc. no. 19.

[3] *See* doc. no. 20 (defendants' brief in support of motion for summary judgment).

[4] Doc. no. 32.

[5] Doc. no. 33.

offering further explanation for his prior recommendation.[6]  Plaintiff objected to the amended R & R,[7] and the case was reassigned to the undersigned.[8]  No defendant ever filed an objection to either the original R & R, or the amended R & R.

The relevant facts are set forth in the original R & R, and they will not be repeated in full here.  As no party has objected to the magistrate judge's factual findings, this court will adopt those findings as its own.

## PART TWO

### Timeliness of Plaintiff's Administrative Appeal

The Magistrate Judge did not make formal findings regarding the existence or non-existence genuine issues of material fact precluding summary judgment on the question of whether plaintiff timely filed her administrative appeal.  Instead, he rested his recommendation — that summary judgment on that issue be denied — on other grounds.  However, the Magistrate Judge did *suggest* that the motion for summary judgment should be denied with regard to the timeliness of plaintiff's administrative appeal, stating that

> because of its dealings with the Plaintiff — the fact that once before MetLife had awarded benefits without requiring a written appeal, and the manner in which MetLife led the Plaintiff to believe that the decision

---

[6] Doc. no. 34.

[7] Doc. no. 36.

[8] Doc. no. 35.

to deny benefits was still open to review, pending consideration of
additional evidence — the decision to deny consideration of an appeal
might be considered as being arbitrary and capricious.[9]

Defendants did not object, or offer any other response, to this statement.  Further, the
court agrees with the Magistrate Judge's reasoning.  Therefore, for the reasons stated
in the original R & R, the court concludes that genuine issues of material fact exist
to preclude summary judgment on the issue of whether plaintiff timely filed her
administrative appeal.

PART THREE

*Timeliness of this Lawsuit*

The only remaining issue is whether plaintiff filed this suit within the
limitations period set forth in the Plan.  The relevant Plan provisions state as follows:

> **10.9   Exhaustion of Plan Remedies.**   No action at law or in
> equity shall be brought to recover under the Policy unless and until the
> claims review procedures in Article VIII of the Plan have been complied
> with *and exhausted*.
>
> **10.10   Limitation of Action.**   In addition to the provisions of
> Section 10.9, no action at law or in equity shall be brought to recover
> Benefits under the Plan prior to the expiration of sixty (60) days after a
> claim has been filed in accordance with the requirements of the Plan,
> *nor shall an action be brought at all unless within one (1) year after*
> *expiration of the time permitted under the Plan for furnishing proof of*
> *disability to the Claims Administrator*.[10]

---

[9] Doc. no. 32, at 17.

[10] Doc. no. 22 (defendants' evidentiary submission), Tab A (Raytheon Company Long-Term
Disability Plan), at document bearing Bates Stamp No. D0030) (boldface and underline emphasis

The Plan does not explicitly define the phrase "the time period permitted under the Plan for furnishing proof of disability to the Claims Administrator."

Thus, plaintiff asserts the provision is inherently ambiguous, and the limitations period must be voided. The Magistrate Judge rejected plaintiff's argument, recommending instead that plaintiffs' lawsuit must be considered untimely, even if the Plan's limitations term is construed in the manner most favorable to plaintiff. He stated:

> Defendants argue that [the limitations] period is the 60 days after the September 18, 2001, letter. In other words, the Defendants contend that the time for appeal (60 days after a denial) is the same period as "the time permitted under the Plan for furnishing proof of disability to [Met Life]." The Plaintiff contends that the limitations period should be voided due to the fact that it contains an "ambiguous trigger." In other words, the Plaintiff contends that it is impossible to tell when the 1 year limitations period begins to run.
>
> However, giving the benefit of every doubt to the Plaintiff, by February 12, 2002, it should have been clear to the Plaintiff that no further proof of disability would be considered and that the time for furnishing same had elapsed. MetLife's letter of February 12th stated clearly that it would not conduct a review of her claim. Again, in a June 10, 2002, letter MetLife confirmed that it would not review the Plaintiff's disability claim further. By that time, the plaintiff was represented by counsel. "[T]he time permitted under the Plan for furnishing proof of disability to [MetLife]" clearly expired when MetLife refused to consider her claim further. Still, the Plaintiff did not file her claim until January of 2004 — a year and a half after the June 2002, letter and nearly two years after the February 2002, letter.

in original, italicized emphasis supplied).

Under these circumstances the trigger for the running of the limitations period is not ambiguous. The Plaintiff's action for benefits is time-barred.[11]

This court agrees that the limitations period should not be discarded as ambiguous. In the Eleventh Circuit, a contractual suit limitations period in an ERISA plan will be enforced, as long as it is reasonable. *Northlake Regional Medical Center v. Waffle House System Employee Benefit Plan,* 160 F.3d 1301, 1304 (11th Cir. 1998). In *Northlake,* the court considered the following factors in deciding that a 90-day contractual limitations period was reasonable: (1) there was no suggestion that the period was "a subterfuge to prevent lawsuits"; (2) the period was "commensurate with other Plan provisions that are designed to process claims with dispatch"; and (3) the plaintiff's suit "followed completion of an ERISA-required internal appeals process." *Id.* Here, there is no indication that the limitations period was designed as a subterfuge to prevent lawsuits. Like the plan discussed in *Northlake,* the Plan here is funded by contributions from participating employees and the employer, not by a third-party insurer. *See id.* Further, the limitations period is not the only Plan provision designed to expedite the resolution of claims. As defendant points out, "the Plan requires claims for benefits to be submitted within 30 days, authorizations to 'be promptly returned,' and, in the case of a failure by a claimant to submit sufficient

---

[11] Doc. no. 32, at 17-18 (bracketed alterations in original).

information after requesting a review, 'the Claim Administrator shall notify the claimant in writing or electronically as soon as possible.'"[12] Finally, as the limitations period is triggered by the expiration of all opportunities to provide proof in support of plaintiff's claim, it would not begin to run until after completion of the available internal appeals process.[13]  Thus, the contractual limitations period is reasonable and enforceable.  The other district court cases cited by plaintiff to support the proposition that the limitations period must be dismissed as ambiguous are merely persuasive authority, and they are distinguishable.   None of the cases employ the standard adopted by the Eleventh Circuit in *Northlake,* and they also are based on different facts.[14]

---

[12] Doc. no. 30 (defendant's reply brief in support of motion for summary judgment), at 5-6.

[13] As set forth in more detail below, however, the questions of when, and whether, the internal appeals period had in fact been exhausted also are important.

[14] Plaintiff primarily relies on *Skipper v. Claims Services International, Unum,* 213 F. Supp. 2d 4 (D. Mass. 2002).  There, the long-term disability policy contained the following contractual limitations clause: "No . . . lawsuit may be brought after two years from the time written proof of loss is required to be given." *Id.* at 5.  The policy did not define the term "proof of loss," but did state that "[p]roof of any loss must be given to [the insurer] within 90 days after a loss begins." *Id.* Skipper received long-term disability benefits under the policy from May of 1990 until October 14, 1997, when his benefits were terminated.  After an internal appeal, the insurer sent Skipper a letter on October 4, 1998, stating that the decision to deny his benefits had been affirmed, and informing him that the company "'would be happy to review any pertinent additional information which would support Mr. Skipper's position that his medical condition prevents him from performing any occupation. . . .'" *Id.* at 6.  When Skipper filed suit on October 4, 2001, the insurance company attempted to have his claims dismissed as untimely, pursuant to the contractual limitations period. The court rejected that argument, stating:

> The fatal defect in defendants' argument is that no reasonable person in plaintiff's circumstances could determine what was intended by the phrase "two years from the time written proof of loss is required to be given."  To an ERISA

Because the contractual limitations period is enforceable, plaintiff's suit will be considered timely as long as she filed it within the limitations period. To evaluate whether plaintiff complied with the limitations period, the court must first determine when that period began to run. The court concludes that the limitations period did not begin to run until *after* plaintiff had exhausted the internal, administrative appeal process. Alternatively, if the limitations period did begin to run earlier, it should have

---

> beneficiary who has submitted his "proof of loss," has had his application for benefits approved, and has then been receiving benefits for a period of many years before being cut-off, this language is pure gobledegook. Here, Skipper submitted his "proof of loss" in 1989 when he initially applied for and began receiving benefits; he was not cut off until 1997. No further "proof of loss" was required or even requested after 1989. Read literally, the policy language would therefore have the absurd result of terminating plaintiff's right to bring suit in 1991, when he was still receiving benefits.
>
> The plain fact is that the contractual limitation language leaves a person like Skipper whose benefits have been cut off completely in the dark as to how to calculate the triggering date for the limitations period. A limitations period without an unambiguous trigger cannot limit anything.

*Skipper,* 213 F. Supp. 2d at 6-7. The court also criticized the defendants for failing to use the term "proof of loss" in the letters it had sent to Skipper requesting additional medical information. *Id.* at 7-8. *See also Mogck v. Unum Life Insurance Co. of America,* 292 F.3d 1025, 1028-29 (9th Cir. 2002) (holding that the contractual limitations period in an ERISA plan did not begin to run after the plan sent a letter to the insured requesting additional medical information, because the letter did not employ the term "proof of loss," which was the term used in the plan's limitations provision).

Here, in contrast, plaintiff's limitations period was triggered by the deadline for "furnishing proof of disability" to MetLife. This terminology is not as narrow as the term "proof of loss" used in *Skipper.* Because plaintiff was allowed to provide additional proof of her disability *after* her benefits were denied, the "absurd" result criticized in *Skipper* — that of the limitations period being triggered while the claimant is still receiving benefits — will not occur here. The limitations provision is not so vague that no reasonable person in plaintiff's position would be able to determine its meaning. Therefore, plaintiff's argument that the limitations period should voided as vague cannot succeed.

been tolled until the administrative process was exhausted.[15]

Although ERISA does not contain an explicit exhaustion requirement, the Eleventh Circuit has held that ERISA plaintiffs should be required to exhaust administrative remedies before filing a lawsuit in federal court. *See, e.g., Perrino v. Southern Bell Telephone & Telegraph Co.,* 209 F.3d 1309, 1315-16 (11th Cir. 2000). The Plan also contains an exhaustion requirement: *i.e.,* "No action at law or in equity shall be brought to recover under the Policy unless and until the claims review procedures in Article VIII of the Plan have been complied with and exhausted."[16]  As defendants point out, the Eleventh Circuit "has not directly addressed the issue of equitable tolling while a plaintiff engages in this administrative process." *Jeffries v. Trustees of the Northrop Grumman Savings & Investment Plan,* 169 F. Supp. 2d 1380, 1382 (M.D. Ga. 2001).  The Magistrate Judge also did not directly address whether the law of tolling should apply here.  Nonetheless, other district courts within the Circuit have recognized the need for tolling. *See id.*  Further, the Eleventh Circuit

_____

[15] Whether the discussion is phrased in terms of the limitations period not beginning to run until after administrative remedies had been exhausted, or in terms of the limitations period being *tolled* pending exhaustion of administrative remedies, the result is the same.  *See Mitchell v. Shearson Lehman Brothers, Inc.,* No. 97 CIV.0526(MBM), 1997 WL 277381, *5 (S.D. N.Y. May 27, 1997) ("Either accrual upon exhaustion of remedies, or accrual upon initial denial and tolling while the claimant exhausts internal remedies, avoids unfairness to the plaintiff.").  Thus, although the court will primarily discuss the applicable principles in terms of tolling of the limitations period, the same result would occur if the discussion were couched in terms of the initial accrual of plaintiff's claims.

[16] Doc. no. 22 (defendants' evidentiary submission), Tab A (Raytheon Company Long-Term Disability Plan), at document bearing Bates Stamp No. D0030.

in *Northlake* considered the fact that the suit was brought only after the completion of the internal appeals process to be an important factor in determining whether the contractual limitations period was reasonable and enforceable. *Northlake,* 160 F.3d at 1304. This court concludes plaintiff should be allowed the opportunity to exhaust her internal administrative appeals before the contractual limitations period begins to run, and that the limitations period, even if it did begin to run while administrative appeals are still pending, should be tolled until those appeals have been exhausted.

This approach is consistent with principles of common sense and fairness. As one court has commented:

> If a claim accrued upon the initial denial of benefits and the limitations period continued to run, the limitations period effectively would be shortened because the plaintiff would not [be] permitted to sue on a claim until he had exhausted his internal remedies. Such a result would be unfair because a plaintiff would be deprived of the full benefit of the limitations period.

*Mitchell v. Shearson Lehman Brothers, Inc.,* No. 90 CIV.0526(MBM), 1997 WL 277381, at *5 (S.D. N.Y. May 27, 1997).[17]

---

[17] This approach also is consistent with that of other courts. *See, e.g., Price v. Provident Life and Accident Insurance Co.,* 2 F.3d 986, 988 (9th Cir. 1993) (holding that the "statute of limitations did not begin to run until [the plaintiff] had reason to know about the denial [of benefits]"); *White v. Sun Life Assurance Co. of Canada,* No. Civ.1:04 CV 80, 2005 WL 1926566 (W.D. N.C. Aug. 11, 2005) ("the parties may not contractually set an accrual date for the statute of limitations other than the date benefits are formally denied to the plan participant"); *Mitchell,* 1997 WL 277381, at *5 ("[A] claim under ERISA does not accrue until the internal remedies mandated by that statute are exhausted."); *Lowry v. Aetna Life Insurance Co.,* No. 96 Civ. 0856(MBM), 1996 WL 529211 (S.D. N.Y. Sept. 18, 1996) ("The correct rule is that, regardless of any date provided in the plan, the accrual date for claims under 29 U.S.C. § 1132(a)(1)(B) is governed by federal law and 'begins to

As the contractual limitations period could not have commenced until plaintiff had exhausted all steps of the administrative appeal process available to her, the outcome of the present dispute turns on the date of exhaustion.  Plaintiff asserts that the administrative process was not complete until she received MetLife's March 5, 2003, denial letter.[18]

Defendants, on the other hand, argue that plaintiff has effectively asserted two separate claims.  Her *original* claim for long-term disability benefits was complete, according to defendants, in November of 2001, because Met Life's September 18, 2001 letter to plaintiff informed her that her benefits were terminated as of September 15, 2001, and that she could file an appeal within sixty (60) days.[19]  Defendants assert that plaintiff then filed a *second* claim in May of 2002, to request a finding of "good cause" for her late appeal.[20]   In this claim, plaintiff argued that the mental impairments she suffered as a result of her stroke left her incapable of comprehending deadlines and organizing an appeal.  Defendants argue that, following plaintiff's *new* request in May of 2002, the only medical information they collected, and the only

---

run when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries.'") (quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund,* 698 F.2d 593, 592 (2d Cir. 1983)).

[18] *See* doc. no. 22 (defendants' evidentiary submission), Tab J, at document bearing Bates Stamp No. D0151.

[19] *See id.,* Tab D, at documents bearing Bates Stamp Nos. D0210-D0212.

[20] *See id.*, Tab G, at documents bearing Bates Stamp Nos. D0201-D0202.

review they conducted, related to plaintiff's capacity to file an appeal, and no further

consideration was given to plaintiff's original request for benefits.  Thus, defendants

argue that plaintiff should have filed suit by November of 2002, one year after the

sixty-day appeal period discussed in the September 18, 2001 letter had expired.

The Magistrate Judge adopted defendants' argument.  In his amendment to the

R & R, he stated:

> What MetLife considered during the time period at issue [between
> February of 2002, when plaintiff received what defendants consider a
> "final" denial letter, and March of 2003, when plaintiff alleges
> defendant still was evaluating her claim for disability benefits] was not
> evidence of whether [plaintiff] was "disabled" under the Plan, but
> whether she lacked the mental capacity to file a timely appeal.  In an
> August 13, 2002, letter, the plaintiff's former lawyer *made clear* that,
> from that time, the plaintiff was seeking a "finding [of] good cause for
> late filing of the appeal by [plaintiff]" and included information on
> Plaintiff's mental impairments, including the results of Dr. Alker's
> neurological testing of Ms. Cosgrove in September and October of 2001.
> . . .
>
>     . . . .
>
> The evidence is clear that, during the period in question, MetLife
> was asked by plaintiff's counsel to allow a late appeal for good cause
> and began to review medical records to determine if good cause was
> present.  There is no evidence disability was extended or that MetLife
> ever reopened the issue of disability.
>
> The plaintiff also argues that because "MetLife was actively
> engaged in evaluating Ms. Cosgrove's claim" until March 5, 2003, the
> limitations period should be administratively tolled.  Even if this court
> accepts that the law of tolling applies to this case, the facts weigh

against tolling in this instance.  As shown above, MetLife was not actively evaluating the plaintiff's claim for *disability* during the period extending until March 5, 2003.  After February of 2002, the only evaluation that was done was as to whether the plaintiff had "good cause" for the filing of a late appeal.  While it may be related, this is still a separate claim from the disability claim.[21]

Based on these facts, the Magistrate Judge again recommended a finding that plaintiff did not file suit within the contractual limitations period.

This court does not agree with the Magistrate Judge's characterization of the facts.  A reasonable factfinder, upon a careful review of the evidence, could conclude that MetLife *did* consider evidence of plaintiff's disability — not just evidence of plaintiff's impaired capacity to comprehend deadlines and organize a lawsuit — within one year of the date on which she filed suit.  Following plaintiff's request for a finding of good cause for her late appeal, MetLife engaged Babbi Winegarden, Ph.D., a clinical neuropsychologist, to evaluate plaintiff's medical records and report on her mental capacity.  In a report dated October 22, 2002, Dr. Winegarden addressed the following questions, which had been proposed by MetLife:

(1)     Based on your review of the medical information provided and that which is obtained during the teleconference, please advise of Ms. Cosgrove's cognitive ability in understanding time limits and instructions on how to file an appeal.

(2)     If the medical information supports that Ms. Cosgrove would not have had the cognitive ability to understand time limits and

---

[21] Doc. no. 34 (Amendment to R & R), at 2-4 (emphasis in original).

> instructions for an appeal request, *does the medical information
> support a severity of cognitive and functional limits beyond the
> 9/15/01 date benefits were terminated?   What would be the
> reasonable duration?*[22]

In response to the second question, Dr. Winegarden stated:

> Ms. Cosgrove would not have trouble telling time or adhering to time
> limits.  However, the ability to organize an appeal may have been
> compromised by her cognitive deficits.  I would suggest that as of the
> date of the neuropsychological evaluation (8/23/01), *Ms. Cosgrove
> would have mild to moderate cognitive deficits in areas that are
> germane to her occupational position such that she would qualify for
> benefits beyond the 9/15/2001 date that benefits were terminated.  I
> would allow six months of treatment and re-assess at that time.*[23]

MetLife obtained a supplemental report from Dr. Winegarden on February 27,

2003, after Dr. Winegarden had reviewed more of plaintiff's medical records.  Dr.

Winegarden stated at the beginning of her supplemental report that the report's

purpose was "to determine Ms. Cosgrove's level of functionality."[24]  MetLife had

posed the following specific question to Dr. Winegarden: "Dr. Winegarden, per your

request, here is the copy of the raw data on Ms. Cosgrove.  *Does the additional

information change your original opinion*?  Please provide an addendum."[25]  Dr.

Winegarden responded:

---

[22] Doc. no. 21 (parties' joint evidentiary submission), at documents bearing Bates Stamp Nos. D0176-D0178 (emphasis supplied).

[23] *Id.* at document bearing Bates Stamp No. D0178 (emphasis supplied).

[24] *Id.* at document bearing Bates Stamp No. D0153.

[25] *Id.* at document bearing Bates Stamp No. D0155.

-14-

In conclusion, Ms. Cosgrove failed a very sensitive test of effort performing below the level of patients with severe brain damage. In addition, there is inconsistency within the test results. These findings call into question all of the test results. Keeping this in mind, the test results suggest that she is functioning at least within the average range intellectually. She shows no problems with attention, language, story memory, complex motor and mental sequencing, basic visuospatial functioning, or problem-solving. She shows some difficulties with memory for work lists and for complex figures. Motor functioning is significantly slowed.

There is no evidence within the data that Ms. Cosgrove did not have the ability to adhere to time lines or organize a written report for appeals request beyond 09/15/01.[26]

After receiving Dr. Winegarden's second report, Met Life sent its final letter to plaintiff's attorney on March 5, 2003, informing him that "MetLife will be unable to conduct a review of Barbara Cosgrove's claim due to the untimely filing of her appeal request."[27] MetLife reiterated that Dr. Winegarden had not found that plaintiff suffered from any cognitive or mental defects that would render her incapable of understanding time limits or filing an appeal. Met Life also informed counsel that "no further administrative reviews [were] available" to plaintiff.[28] Plaintiff contends the contractual limitations period began to run from the date of this letter. Because she filed suit on January 28, 2004, less than one year after MetLife's March 5, 2003, letter, plaintiff asserts her suit is timely.

---

[26] *Id.*

[27] *Id.* at document bearing Bates Stamp No. D0149.

[28] *Id.* at document bearing Bates Stamp No. D0151.

It appears that MetLife obtained Dr. Winegarden's reports *primarily* for the purpose of determining whether plaintiff suffered from a cognitive or mental defect that would prevent her from understanding time limits and filing an appeal, and that Dr. Winegarden's response *primarily* related to that issue. However, construing the facts in the light most favorable to plaintiff, a reasonable factfinder could conclude that Dr. Winegarden also considered evidence of plaintiff's disability (and, consequently, her entitlement to benefits) through the date of her February 27, 2003 report. In the February 27 supplemental report, Dr. Winegarden was called upon to discuss whether the additional information provided to her changed her prior opinion, *i.e.,* the opinion rendered in her original report dated October 22, 2002. In the October 22, 2002, report, Dr. Winegarden had discussed whether the new medical information supported "a severity of cognitive and functional limits beyond the . . . date benefits were terminated."[29]   This request is susceptible of two different interpretations. First, it could be construed to inquire whether plaintiff's limitations were sufficiently severe to warrant a finding of good cause for failing to file a timely appeal. Alternatively, it could be construed to inquire whether plaintiff suffered from a disability that would entitle her to long-term disability benefits beyond the date of denial. Dr. Winegarden's response to the question supports the latter interpretation.

---

[29] *Id.* at document bearing Bates Stamp No. D0178.

Dr. Winegarden opined that plaintiff suffered from defects "in areas that are germane to her occupational position such that she would *qualify for benefits* beyond the 9/15/2001 date that benefits were terminated."[30]

The latter interpretation — as the one more favorable to plaintiff — must be adopted by the court at this summary judgment stage.  If MetLife was considering evidence *of plaintiff's disability* through March 5, 2003, a reasonable factfinder could conclude that her internal appeals had not been exhausted prior to that date. Accordingly, a reasonable factfinder could conclude that plaintiff's claims in this action did not accrue until at least March 5, 2003, and that her January 28, 2004, lawsuit was filed within the one-year contractual limitations period.

## PART FOUR

### *Conclusion*

Based on the foregoing, the R & R will be adopted, insofar as it suggests that summary judgment be denied on the issue of plaintiff's failure to file an appeal within the sixty-day deadline.  The R & R will be rejected, insofar as it recommends that summary judgment be granted on the issue of plaintiff's suit being filed outside the statutory limitations period.  Defendants' motion for summary judgment will be denied.

---

[30] *Id.*

An appropriate order will be entered contemporaneously herewith.

DONE this 27th day of March, 2006.


_____
United States District Judge